Filed 12/30/20  P. v. Coleman CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045801 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1365815) |
| v. | |
| DANIEL DARNELL COLEMAN, | |
| Defendant and Appellant. | |

Defendant Daniel Darnell Coleman sped away from police officers who were attempting to conduct a traffic stop and crashed into another car, killing two people. After a jury trial, Coleman was convicted of two counts of second degree murder (Pen. Code, § 187),[1] possession of a firearm by a felon (§ 29800, subd. (a)(1)), and reckless driving while eluding a peace officer (Veh. Code, § 2800.2).  He was sentenced to an indeterminate term of 60 years to life and a consecutive determinate term of four years.

On appeal, Coleman argues that the trial court erroneously refused his request to instruct the jury with a definition of implied malice that would have clarified the language found in CALCRIM No. 520, the prosecutor committed misconduct by arguing that his actions after the crash proved he acted with implied malice, and the restitution fine and penalty assessments imposed in his case should be stayed pending a determination of his ability to pay.  We affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

BACKGROUND

1. *The Information*

On October 24, 2017, an amended information was filed charging Coleman with two counts of murder (§ 187; counts 1 & 2), a count of possession of a firearm by a felon (§ 29800, subd. (a)(1)), and a count of reckless driving while eluding a peace officer (Veh. Code, § 2800.2, subd. (a)). The amended information also alleged that Coleman had one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).

2. *The Trial*

a. **The Car Crash**

On September 2, 2013, California Highway Patrol Officer Matthew Barge was on duty at approximately 3:17 a.m. He was driving north on Interstate 101, to the south of Interstate 880, when he noticed that a Mercedes-Benz sedan was weaving and traveling over the speed limit. Officer Barge followed the Mercedes as it exited toward the Brokaw Road and North First Street offramp. After the Mercedes turned onto Brokaw Road, Officer Barge attempted to initiate a traffic stop and turned on his overhead lights and forward-facing red and blue lights. Officer Barge's partner used the police car's public address system and instructed the Mercedes's driver to pull over to the right side of the road.

The Mercedes started to slow down, but it made a sudden left turn when the upcoming traffic light turned green. The Mercedes then made a left onto First Street from Brokaw Road, running a red light. Officer Barge decided not to pursue the car because he was familiar with the area, which had restaurants and a casino, and he knew there was a high level of pedestrian traffic in the vicinity. Officer Barge had already witnessed the Mercedes have two near-miss collisions, and he did not believe that it was appropriate to chase the car on city streets. Officer Barge estimated that the Mercedes reached speeds of 75 miles per hour.

At some point, Officer Barge saw a flash of light in the distance in the direction where the Mercedes had headed. Officer Barge's partner commented that he thought there might have been a collision. The officers continued to drive down First Street and arrived at the intersection of First Street and Skyport Drive. There, they saw that the Mercedes had hit a Toyota Yaris. The driver of the Mercedes was not in the car. Officer Barge saw that the traffic light at the intersection cycled to green after they arrived.

Officer Barge saw that two people were inside the Toyota. Both were unresponsive. The Toyota had significant damage to both its driver's side and passenger side. It looked like the Mercedes had impacted the passenger side of the Toyota.

At trial, Officer Barge reviewed a video recording taken using his police car's video recorder. After reviewing the footage, Officer Barge testified that the Mercedes made a number of traffic violations before the crash, including making turns on lanes that were designated as straight lanes.

Saad Calhoun was driving on First Street and had just made a turn on Skyport Drive at around 3:00 a.m. the morning of the collision. He heard a screech and a crunch behind him. Calhoun stopped his car and looked behind him to see what had happened. He saw that two cars, a Mercedes and a smaller car, had crashed into each other. Calhoun gathered his thoughts and made a U-turn toward the accident so that he could offer his assistance. He also called 911.

Ryan West, a firefighter and paramedic, responded to the scene of the crash. West saw that the female passenger in the Toyota, Christina DeLeon Castro, had no pulse and was not breathing. The female driver, Carmen Zavala, had a pulse but had insufficient respirations. Paramedics extricated Zavala out of the car and assisted her with ventilations. As they were loading Zavala into the ambulance, her pulse stopped, and paramedics began CPR. Zavala was pronounced dead at approximately 4:00 a.m. at Valley Medical Center. Castro was pronounced dead at the scene at approximately 3:40 a.m.

Officers who arrived at the scene of the crash collected an airbag that had been deployed by the Mercedes as evidence. Officers also collected blood droplets that were found on the Mercedes's driver's side door.

Dr. Joseph O'Hara, a forensic pathologist, performed autopsies on Zavala and Castro. Zavala sustained injuries that would have ben "quickly lethal," and she would have died within a matter of minutes. Castro's injuries were similar in severity, and she would have also died within a matter of minutes.

b. **The Abandoned Gun**

On September 3, 2013, Michael Gonzales was doing construction at the corner of First Street and Skyport Drive. Shortly after he started work that morning at around 7:00 or 7:30 a.m., he saw a gun on the ground in the dirt. Gonzales picked up the gun with his shirt, and he saw that the gun's serial numbers were grinded or scratched off. Later that day, San Jose Police Department Officer Janet Cusimano arrived at the construction scene and took the gun into evidence.

c. **Coleman's Arrest**

San Jose Police Department Officer Dan Ramirez testified that records reflected that the Mercedes was registered to someone named Cami Farmer.

On September 20, 2013, San Jose Police Department Officer Bret Hatzenbuhler conducted surveillance on Coleman and located him at a shopping mall in Union City. Coleman was at the mall with his wife, who he identified as "Cami Farmer or Cami Coleman." Officer Hatzenbuhler approached Coleman on foot. Coleman appeared nervous and was looking intensely at Officer Hatzenbuhler and at passing cars. Officer Hatzenbuhler entered a nearby store and acted as if he were a customer. Shortly thereafter, Coleman and his wife went into a car and drove to a nearby bank. Officer Hatzenbuhler continued to observe Coleman, and he believed Coleman looked nervous. After Coleman and his wife left the bank, officers arrested Coleman. Coleman vomited after he was arrested.

4

### d. **Forensic Evidence**

San Jose Police Department Detective Michael O'Brien photographed Coleman and took his DNA sample on the day he was arrested. Detective O'Brien noticed that Coleman had a one-inch long scabbed-over cut on the back of his left hand.

A forensic analyst examined the DNA that was obtained from the Mercedes's airbag and a reddish-brown stain that was later found on the abandoned gun's magazine. Coleman was the source of DNA on both the airbag and the stain found on the gun.

### e. **The Accident Reconstruction**

San Jose Police Department Officer Eric Dragoo testified as an expert in traffic collision reconstruction. Officer Dragoo was assigned as the lead investigator in the fatal collision and helped process the crime scene. He observed that the area where the collision had occurred had a speed limit of 35 miles per hour, and the traffic signal lights in the area were working properly. The main damage to the Toyota was on the passenger side, which was crushed inward from the front door all the way to the rear. The Mercedes's front end was damaged, and its hood was buckled.

After examining the tire marks on the road, Officer Dragoo opined that the Mercedes struck the Toyota on its passenger side, rocking the Toyota to the point where the driver's side tires came off the ground. The two cars then separated, with the Toyota going into a clockwise spin heading toward a traffic signal pole. The driver's side of the Toyota then struck the pole, which sent the car into an even more rapid spin until it came to a rest. The Mercedes continued on its own path toward the traffic signal pole. Officer Dragoo did not see anything on the road that would indicate "prebraking" by the Mercedes. However, Officer Dragoo watched some of the videos related to the case, and he saw that the Mercedes's brake lights illuminated shortly before the crash. He opined that if the Mercedes's driver had pressed hard on the car's brakes, there would have been a set of accompanying tire marks on the ground. But there were no tire marks.

5

California Highway Patrol Officer Aaron Huddleston testified as an expert in electronic data retrieval and collision reconstruction. He assisted in the investigation of the crash and retrieved the Toyota's electronic data recorder. Based on the data retrieved from the electronic data recorder, the Toyota was traveling between 13.7 to 14.2 miles per hour at the time of the crash.

The Mercedes did not have an electronic data recorder, but Officer Huddleston used the "angular momentum principle" and calculated that the Mercedes was traveling at approximately 64 miles per hour before the crash. Using the "Monte Carlo methodology," Officer Huddleston calculated that the Mercedes was traveling between 55.1 and 75.6 miles per hour before the crash.

f. **Coleman's Prior Convictions**

The parties stipulated that on December 17, 2008, Coleman was convicted of carrying a concealed firearm (§ 12025, subd. (b)(3)) and that on February 26, 2009, Coleman was convicted of possession of a concealed and loaded firearm (§ 12025, subd. (b)(6)).

g. **Evidence of Other Crimes**

On March 25, 2009, Lodi Police Department Corporal Eric Bradley was conducting surveillance on Coleman. Corporal Bradley saw Coleman and another man get inside a car with Coleman in the driver's seat. Corporal Bradley followed them. Eventually, he saw Coleman drive through a red light. Corporal Bradley activated his emergency lights and honked his air horn, but Coleman continued driving and accelerated from around 60 miles per hour to over 100 miles per hour. The road that Coleman was driving on had a speed limit of 55 miles per hour.

Eventually, Corporal Bradley lost sight of Coleman's car. Corporal Bradley slowed down but continued to drive. He then came across the sight of Coleman's car crashed into a parked car. Coleman was nowhere to be seen.

6

3. *The Verdict and Sentencing*

On October 25, 2017, the jury found Coleman guilty of two counts of second degree murder (§ 187), one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)), and one count of reckless driving while evading a peace officer (Veh. Code, § 2800.2, subd. (a)). The trial court found the prior strike conviction allegation to be true.

On April 6, 2018, the trial court sentenced Coleman to an indeterminate term of 60 years to life, composed of two consecutive terms of 30 years to life for the two murder convictions (§ 187) and a concurrent term of six years for his reckless driving conviction (Veh. Code, § 2800.2, subd. (a)), and a determinate term of four years for possession of a firearm by a felon (§ 29800, subd. (a)(1)).

## DISCUSSION

1. *Instructional Error*

Coleman argues that the trial court erred when it declined to instruct the jury that implied malice requires an act dangerous to human life when there is a high probability that it will cause death as described in *People v. Thomas* (1953) 41 Cal.2d 470 (*Thomas*). Coleman insists that the definition of implied malice found in *Thomas* is stricter than the definition found in CALCRIM No. 520, which the jury was instructed with. Thus, he argues that prejudicial error occurred, and his conviction must be reversed.

a. **The Instructions Given to the Jury**

At trial, the jury was instructed with a modified version of CALCRIM No. 520, which defines the elements of murder as follows: "1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought."

CALCRIM No. 520 gives the following definition of implied malice: "Implied malice is a kind of malice aforethought. Proof of implied malice is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the

7

act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

CALCRIM No. 520 also provides additional instructions on malice aforethought and causation. First, CALCRIM No. 520 clarifies malice aforethought as follows: "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time."

The instruction then explains causation: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

At trial, Coleman's trial counsel requested that the trial court also instruct the jury with the following definition of implied malice, which echoed the language found in *Thomas*, *supra*, 41 Cal.2d 470: "For the purpose of defining the second element of implied malice, an act is dangerous to human life when there is a high probability it will result in death. Such an act is required before implied malice may be found." The trial court declined to give this requested instruction.

b. **Definition of Implied Malice**

Murder is "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice can either be express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) On the other hand, "[m]alice is implied when no considerable provocation appears, or when the

8

circumstances attending the killing show an abandoned and malignant heart." (*Id*., subd. (a)(2).)

"The statutory definition of implied malice, a killing by one with an 'abandoned and malignant heart' (§ 188), is far from clear in its meaning." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) The term "invites confusion and unguided speculation, for it 'could lead the jury to equate the malignant heart with an evil disposition or a despicable character; the jury, then, in a close case, may convict because it believes the defendant a "bad man." ' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103 (*Nieto Benitez*).)

As a result, "[t]wo lines of decisions developed, reflecting judicial attempts to 'translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.' " (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 103.) "The earlier of these two lines of decisions . . . originated in Justice Traynor's concurring opinion in [*Thomas*, *supra*, 41 Cal.2d 470, 480], which stated that malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*Knoller*, *supra*, 41 Cal.4th at p. 152.) This has been referred to as the *Thomas* test. (*Ibid*.)

The second of the two lines of decisions dates from the California Supreme Court's opinion in *People v. Phillips* (1966) 64 Cal.2d 574, overruled on a different ground as stated in *People v. Flood* (1998) 18 Cal.4th 470, 490. In *Phillips*, the Supreme Court determined that malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Phillips*, *supra*, at p. 587.) This has been referred to as the *Phillips* test.

In *People v. Watson* (1981) 30 Cal.3d 290, the California Supreme Court held that the definitions of implied malice articulated in *Thomas* and *Phillips* were substantively

9

similar and articulated the same standard. (*Id*. at p. 300.) In subsequent cases, the Supreme Court has consistently concluded that these two standards are the same. (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 104; *Knoller*, *supra*, 41 Cal.4th at p. 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 (*Dellinger*).)

> c. **Refusal to Give Coleman's Clarifying Instruction**

Coleman argues that the trial court erred when it refused to give his clarifying instruction on implied malice because CALCRIM No. 520, which largely mirrors the language in the *Phillips* test, also states that a natural and probable consequence is one that "a reasonable person would know is *likely* to happen if nothing unusual intervenes." (Italics added.) Therefore, Coleman argues that CALCRIM No. 520's definition of implied malice is different than the *Thomas* test's "high degree of probability" standard. (*Thomas*, *supra*, 41 Cal.2d at p. 480.) Coleman insists that a *likelihood* of death is less than a *high probability* of death; thus, the trial court's failure to give his clarifying instruction effectively lowered the prosecution's burden of proof and resulted in reversible error.

A trial court has a sua sponte duty to give "correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case" (*People v. Williams* (2009) 170 Cal.App.4th 587, 638), including instructions "on all the elements of the charged offenses and enhancements." (*Id*. at pp. 638-639.) However, "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) An appellate court reviews jury instructions de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217.)

First, Coleman argues that the *Thomas* test articulates a higher standard than the *Phillips* test because it requires that the jury find that the defendant commit an act dangerous to life that has a *high probability* that it will result in death. To support his position, Coleman cites to Justice Liu's concurrence in *People v. Cravens* (2012) 53

10

Cal.4th 500, 512 (conc. opn. of Liu, J.) (*Cravens*).  In *Cravens*, Justice Liu noted that prior California Supreme Court cases had stated a preference for the *Phillips* test's formulation for the subjective component of implied malice ("conscious disregard for life") over the *Thomas* test's formulation, but the Supreme Court had also "never disavowed the *Thomas* formulation of implied malice, particularly with respect to the objective component," which, under *Thomas*, requires " 'an act that involves a high degree of probability that it will result in death.' " (*Cravens*, *supra*, at p. 513 (conc. opn. of Liu, J.); see *Dellinger*, *supra*, 49 Cal.3d at p. 1221 [concluding that the better practice is to instruct jury with "straightforward language of the 'conscious disregard for human life' definition of [the subjective component of] implied malice"].)

Justice Liu observed that the majority opinion in *Cravens* cited only the *Phillips* test and did not mention the *Thomas* test when examining whether there was sufficient evidence to support the objective component of implied malice.  (*Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.).)  After reiterating that the Supreme Court had previously held that the *Thomas* test was equivalent to the *Phillips* test, Justice Liu determined that the majority's failure to discuss the *Thomas* test—even though the *Cravens* defendant and the Court of Appeal below relied upon it—"suggests (but does not hold) that the *Phillips* formulation matters in a close case such as this." (*Id*. at p. 514 (conc. opn. of Liu, J.).)  Justice Liu then wrote, "If *Thomas*'s 'high degree of probability' test is to become disfavored in our doctrine, I prefer we consider and resolve the issue explicitly—if not in this case, then in a future case—instead of leaving it to mere implication." (*Ibid*. (conc. opn. of Liu, J.).)  Justice Liu stated that he expressed no views on *Thomas*'s continued validity because the issue was not specifically before the court. (*Ibid*. (conc. opn. of Liu, J.).)

Coleman argues that Justice Liu's concurrence in *Cravens* suggests that there is a distinction between the *Phillips* test and the *Thomas* test.  Justice Liu's concurrence, however, is not binding precedent.  (*People v*. *Byrd* (2001) 89 Cal.App.4th 1373, 1383

11

[" 'no opinion has value as a precedent on points as to which there is no agreement of a majority of the court' "].) Moreover, as Justice Liu himself noted in his concurrence, the California Supreme Court has consistently held in past cases that the *Phillips* test and the *Thomas* test are substantively the same. (*Cravens*, *supra*, 53 Cal.4th at p. 514 (conc. opn. of Liu, J.); *Nieto Benitez*, *supra*, 4 Cal.4th at p. 104; *Knoller*, *supra*, 41 Cal.4th at p. 152; *Dellinger*, *supra*, 49 Cal.3d at p. 1219.) The Supreme Court has never expressly disapproved the *Thomas* test, nor has the court ever concluded that the *Phillips* test and the *Thomas* test articulate a different standard. We are bound by the Supreme Court's prior decisions on this issue, and Coleman's contrary argument must be rejected. (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Furthermore, the California Supreme Court dismissed an argument similar to Coleman's claim of instructional error in *Nieto Benitez*, *supra*, 4 Cal.4th 91. In *Nieto Benitez*, the jury was instructed that to find implied malice, it must find that " '[t]he natural consequences of the [defendant's] act [were] dangerous to human life.' " (*Id*. at p. 100.) On appeal, the defendant argued that the trial court misstated the law because the instructions given to the jury omitted "a requirement that [the] defendant commit the act with a *high probability* that death will result." (*Id*. at p. 111.) The Supreme Court rejected this challenge, concluding that "the two linguistic formulations [under *Phillips* and *Thomas*]—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent . . . ." (*Ibid*.)

Like the jury in *Nieto Benitez*, the jury in this case was instructed that the second element of implied malice was that "[t]he natural and probable consequences of the act were dangerous to human life." As stated in *Nieto Benitez*, this language is substantively the same as the clarifying instruction that Coleman requested—that an act is dangerous to human life when there is a high probability it will result in death. (*Nieto Benitez*, *supra*, 4

12

Cal.4th at p. 111.) The trial court was also not required to give instructions that it found to be duplicative. (*Moon*, *supra*, 37 Cal.4th at p. 30.)

Coleman argues that *Nieto Benitez* does not foreclose his argument because the case considered the definition of implied malice set forth in CALJIC No. 8.31, which did not contain the additional definition of "natural and probable consequence" found in CALCRIM No. 520—that "a *natural and probable consequence* is one that a reasonable person would know is *likely* to happen if nothing unusual intervenes." (Second italics added.)

We find no merit in Coleman's argument. When we review claims of instructional error, we must consider the instructions as a whole and do not assess error based solely on one part of an instruction. (*People v. Salazar* (2016) 63 Cal.4th 214, 248.) As we have stated above, CALCRIM No. 520 uses the phrase "natural and probable consequence" in two separate areas: when discussing causation and when describing the second element of implied malice. The "likely to happen" definition of a "natural and probable consequence" found in CALCRIM No. 520 does *not* immediately follow the instruction's definition of implied malice. The definition is found in a separate paragraph following the definitions of murder and implied malice, and appears in the following context: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes." In other words, the definition of a "natural and probable consequence" that Coleman takes issue with is directed at whether an act *causes* death, not at any of the elements of implied malice.

Even if we assume that a reasonable juror applied the "likely to happen" definition of a "natural and probable consequence" to the second element of implied malice, we would reject Coleman's argument that failing to include his clarifying instruction confused the jury or diluted the prosecution's burden of proof. Multiple cases have used

13

the phrase likely to cause death or injury when discussing implied malice. In *People v. Conley* (1966) 64 Cal.2d 310, abrogated by statute on another ground as stated in *People v. Bryant* (2013) 56 Cal.4th 959, the California Supreme Court stated that a defendant has the "wanton disregard for human life or antisocial motivation that constitutes malice aforethought" if "he does an act that is *likely to cause serious injury or death* to another." (*Conley*, *supra*, at p. 322, italics added.) Likewise, in *People v. Coddington* (2000) 23 Cal.4th 529, abrogated by statute on another ground as stated in *People v. Zamudio* (2008) 43 Cal.4th 327, the Supreme Court determined that evidence that the defendant "acted with actual or presumptive knowledge that serious bodily injury was *likely to occur*" permitted an inference of implied malice. (*Coddington*, *supra*, at p. 592, italics added.)

Coleman, however, argues that the term "likely" is ambiguous and requires a clarifying instruction. In support of his position, Coleman cites to *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888. In *Ghilotti*, the California Supreme Court stated that the term " 'likely' may be used flexibly to cover a range of expectability from possible to probable." (*Id.* at p. 916.) *Ghilotti*, however, does not aid Coleman. *Ghilotti* considered the use of the term "likely" in the specific legal context of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), and the term has a "particular and technical meaning" within the SVPA. (*Ghilotti*, *supra*, at pp. 916-917; *People v. Roberge* (2003) 29 Cal.4th 979, 988 ["[n]ot all . . . dictionary definitions of 'likely' are consistent with the particular and technical meaning the SVPA assigns that term"].) " 'A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning.' " (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023.)

In this case, we are not concerned with the technical, legal definition of the term "likely." The Oxford English Dictionary defines the "likely" as "having a high chance of occurring; probable." (Oxford English Dict. Online (2016) < **https://perma.cc/6AD4-**

14

**EVTG**> [as of Dec. 30, 2020].)  This definition fits within the context of CALCRIM No. 520 and the elements of implied malice—that the natural and probable consequence (one that a reasonable person would know is likely to happen if nothing unusual intervenes) of Coleman's act must have been dangerous to human life.  The trial court was not required to instruct on the meaning of terms that are commonly understood. (*People v. Malone* (1988) 47 Cal.3d 1, 54-55.)

Thus, the trial court did not err when it declined to give Coleman's clarifying instruction on the definition of implied malice.

2.  *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Next, Coleman argues that the prosecutor committed misconduct when she argued that his actions after he committed the crime showed that he had implied malice.  He also insists that his trial counsel rendered ineffective assistance by failing to request that the trial court admonish the jury to disregard the prosecutor's improper argument.

a.  **The Prosecutor's Closing Argument**

During her closing argument, the prosecutor made the following statement:  "Now going to the conscious disregard of human life.  In determining whether a defendant acted with conscious disregard for human life, you can consider his conduct and state of mind before, during, and after the crime."  Coleman's trial counsel objected to this argument on the ground that it misstated the law.

Following a sidebar with both counsel, the trial court admonished the jury as follows:  "All right, members of our jury, if there is a conflict or an inconsistency between what the attorneys say and what the jury instructions say the jury instructions control, okay?  Remember the comments of counsel are not evidence."

The trial court then permitted the prosecutor to continue her closing argument. The prosecutor stated:  "When you are looking at somebody's mental state and trying to figure out what that is, you have to look at what that person did before, during, and after for you to know what their mental state is.  That makes sense.  That's just common sense.

15

And here you're going to have to decide what his mental state is and whether that is a conscious disregard for human life. You have to look at all of the evidence: before, during and after."

The prosecutor then argued that Coleman's actions before the crash, such as his failure to stop at red lights and his decision to evade the police, showed that he had the required mental state. The prosecutor then turned to Coleman's actions after the crash and argued: "But you have more evidence of his state of mind. You have more evidence of malice. And that's what he did after. After this crash, . . . he fled on foot before the police can arrive. And the police arrived what, 30, 40 seconds, less than a minute? He threw the gun over the fence. He put himself over—his life over other human lives, even after he killed Miss Zavala and Miss Castro in this violent collision that he did, that he caused. He got out of his car and he had the wherewithal to get his gun. Whether it was in his car or on his person he got out, closed the door and threw it over the fence and ran before the police could even arrive. He did all of this after this type of wreckage occurred, okay? What does that tell you? It tells you that he knew what was about to happen. He had a plan for it, okay? There's a plan A, and the plan is to get away. We get that, right, he wanted to get away. Dangerous to human life, okay. [¶] The plan B is if he crashes, he's going to throw his gun away and he's going to run, okay. Because anybody else who is going to be in that type of collision, this type of crash that is so violent, and that clearly killed somebody in the car, would be shaken up and traumatized like 'what just happened?' [¶] But no. [¶] The defendant, he's not shaken up or traumatized at all. He knows exactly what he's doing. He's going to get that gun. Throw it over the fence and be gone. He has the wherewithal to do all of that before the CHP and Mr. Calhoun arrived. That tells you what he's thinking. You get to put that in your consideration when you consider what he's thinking because—"

Coleman's trial counsel objected to the argument, and the trial court had an unreported bench conference with both attorneys. After the bench conference, the

16

prosecutor continued: "Let me clarify. What he does after allows you to know, right, and decide what he was thinking before, right? I think that's common sense. You look at what somebody does before, during and after to see what they were thinking about before. So this is malice aforethought, right, the malice is there before he does the driving that causes the death. But in order to determine that, you need to look at all of the evidence, and you need to look at his actions and what his state of mind was to know what it was before. That's what you were deciding."

Later, the prosecutor added: "After [Coleman] killed two people he fled, right? He continued to flee until the police found him 18 days later. He never turned himself in. He appeared nervous. He was looking around. Wearing fake glasses. Covering up. And then he threw up when he was arrested. And you can use that as consciousness of guilt. You can use that as evidence of what he was thinking before he crashed, right?"

After both attorneys made their closing argument and outside the presence of the jury, the trial court stated: "I just did want to put on the record, to the best of the court's ability, the discussion that we had off the record regarding [the prosecutor's] argument about Mr. Coleman's actions after the collision, and the fact that that could be used to support a finding of malice aforethought. [¶] [The prosecutor] clarified at the bench that, perhaps, the manner in which it was being stated was not what she intended, and that is that she intended to use what Mr. Coleman did after the collision to show what he was thinking before the collision. And the court would rule that that can be used as proper argument. But the manner in which the slide was presented said that the actions after could be used to support malice aforethought. And that is just a misstatement of the law. It is parsing. It may be splitting hairs, but it is a misstatement of the law."

In response, the prosecutor argued that "[t]he actions that [Coleman] does afterward can be considered to determine whether he had malice aforethought." The trial court disagreed and stated: "They cannot. They can be used to show what he may have been thinking before. Then you're going to talk about what he was thinking before.

17

And that could be malice aforethought. You'll get to the same place, it's how you're phrasing it. So we can't say that what he did after supports malice aforethought. We can say that what he did after may support what he was thinking beforehand, your getaway plan, you had some specifics that you were arguing. [¶] I'm absolutely not precluding you from arguing those. I think stating that that is malice aforethought, what he did after is an incorrect statement of the law. I am not precluding you from arguing what he did after. And I'm also not precluding you from connecting with what he did after to what he may have been thinking before. And I believe [defense counsel] is not either. It's saying that what he did after is malice aforethought. And that's how you stated it."[2]

b. **Postcrime Actions as Evidence of Implied Malice**

Coleman argues that the prosecutor committed misconduct when she argued that Coleman's actions after the car crash showed that he had implied malice. Coleman also insists that his trial counsel was ineffective for failing to request a more specific admonition after the prosecutor made her argument. As we explain, we find no merit in Coleman's claims.

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

---

[2] In his opening brief, Coleman cites to the slideshow that the prosecutor used during her closing argument. Coleman, however, did not request that the exhibit be transferred to this court. (See Cal. Rules of Court, rule 8.224(a)(1).)

18

Prosecutors are given "significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).) However, a prosecutor commits misconduct if he or she misstates the applicable law. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, at p. 666.)

First, we reject Coleman's argument that the prosecutor committed misconduct when she argued that his postcrime actions could be used as evidence that he had the mental state of implied malice at the time he committed the crime. In support of his position, Coleman relies on *People v. Anderson* (1968) 70 Cal.2d 15, 32. In *Anderson*, the defendant was convicted of murdering a 10-year-old girl. (*Id.* at p. 19.) After committing the murder, the defendant attempted to " 'cover up' the crime by lying to the brother and the mother of the victim." (*Id.* at p. 32.) The California Supreme Court in *Anderson* concluded that "[a]lthough this type of evidence may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing. Evasive conduct shows fear: it cannot support the double inference that defendant planned to hide his crime at the time he committed it and that therefore defendant committed the crime with premeditation and deliberation." (*Ibid.*) As a result, *Anderson* concluded there was insufficient evidence to support a finding of premeditation and deliberation without evidence of "(1) defendant's actions prior to the killing, (2) a 'motive' or 'reason' from which the jury could reasonably infer that defendant intended to kill [the victim], or (3) a manner of killing from which the jury could reasonably infer that the wounds were deliberately calculated to result in death." (*Id.* at pp. 33-34.)

19

*Anderson* does not hold that evidence of postcrime conduct cannot be probative of a defendant's state of mind at the time of the crime. In *People v. Thompson* (2010) 49 Cal.4th 79, 113, the California Supreme Court clarified its decision in *Anderson* as follows: "While our comment in *Anderson* thus warns against using evidence of a defendant's postcrime actions and statements as the *sole support* for upholding a finding of premeditated and deliberate murder, such postcrime actions and statements can support a finding that defendant committed a murder for which his specific mental state is established by his actions before and during the crime." (Italics added.)

In this case, Coleman's postcrime conduct—throwing away the gun and fleeing the scene—supported an inference that he had implied malice at the time of the crash. And unlike *Anderson*, Coleman's postcrime conduct was not the only evidence of implied malice. As the prosecutor argued, Coleman's actions before the crime were also indicative of his mental state, including his decision to run multiple red lights and to evade the police. Therefore, the prosecutor did not misstate the law or commit misconduct when she argued that Coleman's postcrime conduct was probative as to his mental state at the time he committed the crime.

We acknowledge that according to the trial court's comments, the prosecutor presented a slide to the jury that suggested that Coleman acted with implied malice *after* the crash and that having the mental state of implied malice *after* the crash was sufficient to support a finding of murder.

Even if the prosecutor's slide misstated the law, Coleman's trial counsel objected to the misstatement below, and the trial court gave an admonition to the jury. The trial court advised the jury that conflicts or inconsistencies between the attorneys' arguments and the jury instructions must be resolved in favor of the jury instructions. Here, the jury was instructed with CALCRIM No. 520 on the elements of implied malice murder, which required that the jury find that the defendant had the mental state of implied malice when he committed the act. In other words, the jury was instructed that to find Coleman guilty

20

of murder, he must have had implied malice at the time of the crash, *not* after the crash. We presume that the jury followed these instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 764 [jury is presumed to have followed instruction that statements of attorneys are not evidence].)

Furthermore, when we consider the prosecutor's remarks as a whole, we do not believe "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 666.) As we have described, the bulk of the prosecutor's argument properly focused on Coleman's postcrime conduct as probative of his mental state *during* the crime.

Finally, Coleman argues that his trial counsel rendered ineffective assistance by failing to request that the trial court give the jury a more specific admonition. His trial counsel, however, could have reasonably believed that the trial court's admonition to the jury was already sufficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [ineffective assistance of counsel requires representation that was objectively unreasonable].) Thus, Coleman's claim of ineffective assistance of counsel fails.

3. *Cumulative Error*

Coleman argues that to the extent any of the alleged errors are not individually prejudicial, the cumulative effect of the errors requires reversal of the judgment. (*Hill*, *supra*, 17 Cal.4th p. 844.) We have considered each of Coleman's arguments and have concluded that there was no instructional error and no prejudicial prosecutorial misconduct. Since there are no errors to cumulate, Coleman's claim of cumulative error must be rejected.

4. *Fines and Fees*

Finally, Coleman argues that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the trial court erred in imposing certain fines and fees without first determining his ability to pay.

a. **Coleman's Fines and Fees**

At the sentencing hearing, the trial court imposed a $300 restitution fine under section 1202.4, subdivision (b)(2), a $4 emergency medical air transportation fine under Government Code section 76000.10, a $160 court security fee under section 1465.8, and a $120 criminal conviction assessment under Government Code section 70373. The trial court declined to impose the $129.75 criminal justice administration fee because there was "no evidence . . . before the Court which would justify the imposition of that fee." The trial court asked Coleman's trial counsel if Coleman waived the right to "[a] hearing regarding his ability to pay the minimum fines and fees imposed under these orders, as well as a breakdown of the fines and fees imposed under these orders." Coleman's trial counsel answered, "Yes, Your Honor."

The trial court also ordered Coleman to pay victim restitution in the amount of $10,000 to the California Victims Compensation Board. When asked about the victim restitution order, Coleman's trial counsel stated, "[M]y client would like the Court to know that prior to his incarceration I believe he had just gotten a job. But he had no, essentially, means, or means of employment. I would submit on that." The trial court then asked if Coleman wanted a hearing on victim restitution, and Coleman's trial counsel answered, "No, Your Honor."

b. ***Dueñas***[3]

In *Dueñas*, the defendant was an unemployed, homeless probationer with cerebral palsy who spent her benefits and food stamps on her two children. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160-1161.) The defendant had received juvenile citations when she was a teenager, which led to fines, which led to her driver's license getting suspended

---

[3] Appellate courts have reached conflicting conclusions on whether *Dueñas* was correctly decided, and the issue is presently pending before the California Supreme Court. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

after she could not repay her debts. (*Id*. at p. 1161.) She was then convicted several times for driving with a suspended license, which resulted in her spending time in jail because she could not afford to pay the fines associated with her convictions. (*Ibid*.) After her most recent conviction of driving with a suspended license, the defendant requested that the trial court set a hearing to determine her ability to pay previously-assessed attorney fees and other court fees. (*Id*. at p. 1162.) After an ability-to-pay hearing, the trial court determined that the defendant lacked the ability to pay attorney fees and waived them. (*Id*. at p. 1163.) The trial court, however, also determined that the criminal conviction assessment imposed under Government Code section 70373 and the court operations assessment imposed under section 1465.8 were mandatory regardless of the defendant's ability to pay, and the defendant had not shown the " 'compelling and extraordinary reasons' " required by section 1202.4, subdivision (c) to justify waiving the assessments. (*Dueñas*, *supra*, at p. 1163.)

On appeal, the Second Appellate District reversed the trial court's order. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) With respect to the criminal conviction and court operations assessments, *Dueñas* first observed that both assessments were not intended to be punitive in nature. (*Id*. at p. 1165.) *Dueñas* then examined several California and United States Supreme Court decisions involving indigent defendants and fees: *Griffin v. Illinois* (1956) 351 U.S. 12, which held that due process and equal protection principles require that all people charged with a crime be treated equally; *In re Antazo* (1970) 3 Cal.3d 100, which invalidated the practice of requiring defendants to serve jail time if they were unable to pay a fine and penalty assessment; and *Bearden v. Georgia* (1983) 461 U.S. 660, which held that it violated the federal Constitution to revoke an indigent defendant's probation for failing to pay a fine and restitution. (*Dueñas*, *supra*, at pp. 1166-1169.) Relying on these three cases, *Dueñas* held that imposing the criminal conviction and court operations assessments without determining a defendant's ability to pay was fundamentally unfair and violated due process. (*Id*. at pp. 1168-1169.)

23

With respect to the restitution fine under section 1202.4, subdivision (b), *Dueñas* held that the execution of the fine must be stayed until the People can demonstrate that the defendant has the ability to pay the fine. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1172.)

c. **Waiver**

Here, the trial court expressly asked Coleman if he waived his right to "[a] hearing regarding his ability to pay the minimum fines and fees" imposed in his case. Coleman's trial counsel responded "[y]es." Defendant, however, argues that at the time of his waiver, the fines and fees imposed in his case were not subject to an ability to pay determination, he was not giving up a legal recognized right when his counsel waived a hearing on his behalf, and the fines and fees would have been imposed regardless of the hearing's outcome. The Attorney General disagrees and argues that Coleman cannot challenge his fines and fees because he failed to raise an objection below.

On this record, we conclude that Coleman has waived his right to an ability to pay hearing. The trial court gave Coleman the opportunity to demonstrate his inability to pay the fines and fees imposed in this case. Coleman, through his trial counsel, expressly relinquished his right to a hearing on his ability to pay—which is what he now seeks on appeal. Therefore, we conclude that his express waiver at the sentencing hearing waived any right to an ability to pay hearing.

## DISPOSITION

The judgment is affirmed.

24

_____
                                        Premo, Acting P.J.


WE CONCUR:



_____
            Elia, J.




_____
      Bamattre-Manoukian, J.




People v. Coleman
H045801